**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| PARISH OF CHRIST CHURCH aka PARISH OF CHRIST EPISCOPAL CHURCH; and DIOCESE OF NEW HAMPSHIRE aka EPISCOPAL CHURCH OF NEW HAMPSHIRE, | |
| Plaintiffs, | Civ. Action No. 1:25-cv-00019-LM-TSM |
| v. | **FIRST AMENDED COMPLAINT JURY TRIAL DEMANDED** |
| TDBANK, N.A., AS TRUSTEE OF THE JOHN ELWYN STONE TRUST, and ATTORNEY GENERAL, DIRECTOR OF CHARITABLE TRUSTS, | |
| Defendants. | |

The Parish of Christ Church, a.k.a. the Parish of Christ Episcopal Church (the "Church"), and Diocese of New Hampshire, a.k.a. Episcopal Church of New Hampshire (the "Diocese"), by and through their attorneys, McLane Middleton, Professional Association, bring this Complaint against TDBank, N.A. (the "Bank") in its capacity as Trustee of the John Elwyn Stone Trust (the "Trust"), stating as follows:

**INTRODUCTION**

1.      In response to the ever growing, ever urgent need in New Hampshire (and the Seacoast Region in particular) for affordable housing and childcare, and in line with its social justice objectives, ministerial missions, and ecclesiastical purposes, the Church seeks to redevelop a portion of property it owns in Portsmouth, New Hampshire to construct affordable housing units, offer short-term residency and program support to the victims of sexual and domestic violence, expand its childcare center, and renovate its existing worship facilities (the "Project").  These objectives, fully in line with the Church's mission and purpose and plainly

serving urgent community needs, have been stymied by the Bank, which has cited to decades-old restrictions on the property (which restrictions are expressly disfavored by New Hampshire policy and legislation) as the only rationale for thwarting the Project.  The Diocese conceived of and developed the Project alongside Portsmouth Housing Authority Development, Ltd. ("PHAD"), a New Hampshire non-profit corporation specializing in the development of affordable housing.  Despite both the Diocese and PHAD having invested significant resources into the Project, and the dire community need for such a Project to become a reality, the Bank has pulled the plug, stating without support that the Project does not serve "ecclesiastical purposes." By so doing, the Bank has denied critical services to New Hampshire residents in the Seacoast Region, a decision that disparately impacts minorities and families with children in violation of federal law.  The Bank also ignores that the Property would continue to serve as a worship space and church for local parishioners should the Project be realized. Yet, this move jeopardizes the existence of the Church, the future survival of which depends upon the Church exploring ways to capitalize on its greatest asset—the use of its property for the good of the community.  The Church and the Diocese seek judicial intervention to prevent these injustices and to allow their Project to move forward.

### PARTIES

2.      The Church is an unincorporated, non-registered religious organization, *cf.* RSA 306:3-a; RSA 306:4; Jus 402.01, in the State of New Hampshire located at 1035 Lafayette Road in Portsmouth, New Hampshire 03801, with a business address at 63 Green Street in Concord, New Hampshire 03301.  The Church is a part of the Diocese.

3.      The Diocese is an unincorporated group of Episcopal churches under the supervision of the Bishop of the Protestant Episcopal Church in New Hampshire (the "Bishop"),

which churches agree to the Diocese's Constitution and Canons as well as the canons of the

Protestant Episcopal Church of the United States of America upon joining the Diocese.  The

Diocese is an unincorporated, non-registered religious organization, *cf.* RSA 306:3-a; RSA

306:4; Jus 402.01, with a business address at 63 Green Street in Concord, New Hampshire

03301.

       4.     The Bank is an American national bank and the United States subsidiary of the

multinational TD Bank Group.  Its headquarters is located at 1701 Marlton Pike E, Ste 200,

Cherry Hill, New Jersey 08003.  It systematically transacts business in the State of New

Hampshire.  The Bank is currently the Trustee of the Trust, a testamentary trust that is governed

by the laws of the State of New Hampshire.

       5.     Mary Ann Dempsey, Esq., is the duly appointed Director of Charitable Trusts

("Director") under RSA 7:20 having the authority and duty to supervise charitable trusts in the

State of New Hampshire.  The Director, as the Attorney General's representative, is an

indispensable party to the cy pres claim in this proceeding.  *See Concord Nat'l Bank v.*

*Haverhill,* 101 N.H. 416, 419 (1958).  The Director maintains her office at 1 Granite Place

South, Concord, New Hampshire 03301.

## JURISDICTION AND VENUE

       6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1367(a).

       7.     Venue is proper in this district because the property that is the subject of the

action is located in Portsmouth, New Hampshire, and a substantial part of the events or

omissions giving rise to the claim occurred in New Hampshire.  28 U.S.C. § 1391(b)(2).

## ALLEGATIONS COMMON TO ALL COUNTS

### *The History of the Church's Property*

8.    The Church is the record owner of property located at 1035 Lafayette Road in Portsmouth (the "Property").  The Property includes 3.49 acres of land improved by two structures.

9.    The Church has owned the Property since John Elwyn Stone conveyed same to the Church by way of deed dated June 17, 1964.  *See* 1964 Deed, attached hereto as **Exhibit 1**.

10.    On the same day Stone deeded the Property to the Church, the Church and Stone executed an agreement (the "1964 Agreement") whereby Stone agreed to sell to the Church the Property in exchange for the Church agreeing to erect an Episcopal Church on the premises "as a successor to its Church destroyed by fire."  *See* 1964 Agreement, attached hereto as **Exhibit 2**. The parties agreed that the design for that church "must first be approved prior to construction" by Stone, and that "this property will be used solely for ecclesiastical purposes and that in the event of the use of the property for any other purposes, the title to the property shall revert to the Seller, his heirs, executors, administrators and assigns."  *Id.*  The 1964 Agreement provided that "[e]cclesiastical purposes shall permit church fairs, bazaars, sales, auctions, public meals, sale of religious goods, educational activities, etc., but shall not permit use solely as a playground."  *Id.*

11.    The 1964 Agreement was not recorded at the time the deed to the Property was recorded.  Nor was the 1964 Agreement referenced in the deed to the Property.

12.    Approximately eighteen months following the deed and the 1964 Agreement, the parties entered into an Indenture of Agreement on December 29, 1965 (the "1965 Agreement"). The preamble to the 1965 Agreement states that the Church, "without prior notice to or approval of STONE proceeded to construct a building upon the premises that was not a church nor

approved in design by STONE, allegedly as a Rectory, provision for which was not expressly made in the agreement of June 17, 1964." 1965 Agreement, attached hereto as **Exhibit 3**. Stone agreed to "release[] and forever surrender[] to CHURCH any and all rights he may have to reversion of the realty for condition broken in respect to any structures erected or in the process of being erected upon the property on or prior to the date of this agreement" in exchange for additional covenants imposed on the Church. *Id.* Those additional covenants included, with the exception of a garage, that "no other buildings shall be constructed upon the aforesaid property nor ells nor extensions on existing structures unless authorization of STONE is obtained." *Id.* The 1965 Agreement also provided that Stone had the right, either by will or by instrument duly acknowledged, to appoint a person who shall succeed to and have all the rights with respect to the covenants, "including the right to enforce reversion to STONE'S estate of the realty for condition broken." *Id.*

13.    In his will, Stone devises "[a]ll the rest, residue and remainder of my estate, real and personal, wherever found and however situate," to "[t]he First National Bank of Portsmouth . . . in trust" under certain terms and conditions. *See* Stone's Will, attached hereto as **Exhibit 4**, ¶ 7. Stone directs the Trustee to "devise and bequeath all my real estate" to the State of New Hampshire as a tree farm, bird sanctuary, or wildlife preservation or, if such purposes should not qualify, then solely for socioecological use that qualifies as a public charity. *Id.* If the State does not accept this charitable grant for the purposes stated, then the Trustee is directed to deed the properties to an endowment fund with public and charitable purposes. *Id.* Stone's testamentary trust was directed to be a non-profit organization of permanent duration. *Id.*

14.    By way of codicil to his will, on May 22, 1971, Stone appointed the Trustee named in his Will—the First National Bank of Portsmouth or its successor—the full right and

power to enforce the possibility of reverter on the Property.  Codicil, attached hereto as **Exhibit 5**.

15.     On November 3, 1972, Stone executed a "Supplement to Indenture of Agreement" whereby he appointed Ronald L. Snow, pursuant to paragraph 5 of the 1965 Agreement, to succeed Stone and have all the rights with respect to the covenants in the 1965 Agreement, including the right to enforce Stone's alleged possibility of reverter. *See* Supplement to 1965 Agreement, attached hereto as **Exhibit 6**.

16.     Stone died on May 16, 1974.

17.     Snow died on March 14, 2008.

18.     The Bank became the successor to First National Bank of Portsmouth by, upon information and belief, acquiring that bank.  The Bank now serves as Trustee of Stone's testamentary trust.

### *The Church's Financial Struggles*

19.     Long gone are the days where church fairs, bazaars, sales, or auctions can help the Church fundraise enough money to stay financially viable.  For years, the Church has been dependent upon income from the childcare center it runs and from renting its rectory to another non-profit to house a refugee family.  The Church last rented the rectory in 2022 and 2023, but is no longer receiving rental income from the rectory.  At most, that income totaled $18,000 per year.  Upon information and belief, the childcare center is having trouble affording its $29,000 annual rent and is expected to vacate the building in which it is currently located sometime in 2025.

20.     Even with these income sources, the Church just barely meets its operating expenses.  While the Church is fortunate to have been gifted the Property, the costs of that

Property are also a burden on the Church's budget.  The Church has foregone many maintenance items to cut costs.  For example, the Church will often not mow its lawn for weeks at a time to save on costs.  The Church has also deferred other maintenance items to keep down expenses. The Church has only a small endowment, which endowment is permanently restricted.

21.     In light of the Church's financial struggles, it has looked to other opportunities for how it can help serve the community with its largest asset (the Property) while keeping its organization sustainable.  One such opportunity would be for the Church to allow another organization to use the Property alongside the Church, thus reducing the Church's long-term maintenance costs, and putting the Church on a more sustainable path.  PHAD presented itself as such an organization, as it could develop the Property in a manner that aligns with the Church's ecclesiastical purposes and social justice mission and maximize the Property's use for the benefit of the community, while also injecting significant capital into a Project that the Church would otherwise not be able to accomplish on its own.

22.     Pursuant to the Diocese's Constitution and Canons, as all real and personal property is held in trust for the Diocese.  For this reason, no property can be alienated or encumbered without the approval of the Bishop.  The Diocese has fully supported the Project and taken steps to help realize the Project, which is in line with the Church's ecclesiastical purposes and social justice mission.

### *The Church and Diocese Partner with PHAD to Pursue the Project*

23.     In this vein, the Church and the Diocese established a Redevelopment Steering Committee to determine their interest in entering into a long-term ground lease to achieve as many of the following goals as possible:

  a.   Continued operation of the Church's Little Blessing Childcare Center;

b.  Preservation of the existing African American Burial Ground;

c.  Preservation and/or relocation of the Christ Church memorial burial ground;

d.  Provision of multi-use congregational worship space;

e.  Development or provision of a three-bedroom emergency housing suite, six (6) one to two-bedroom apartments, and 8,500 square feet of office space to enable the provision of supportive services for victims of domestic violence and education for the provision of domestic violence; and

f.  Development of approximately 36–44 affordable workforce housing apartments.

24.     In reviewing and assessing its goals, the Church and the Diocese determined it was in their best interest to work exclusively with PHAD and HAVEN, a non-profit organization dedicated to violence prevention and support services.  By way of a Memorandum of Understanding dated January 4, 2024, the Diocese agreed with PHAD to enter into a Development Agreement and Ground Lease Agreement, which ground lease would permit the sublease of a portion of the Property to HAVEN.  Among other things, the Diocese and PHAD agreed that PHAD would engage with third parties to design and develop a three-bedroom emergency housing unit and six transitional housing units to be operated by HAVEN and 35–45 affordable workforce housing units.  PHAD also agreed to assist in identifying sufficient, affordable commercial real estate, either on site or off site, to accommodate the needs of the Church's childcare center, Little Blessings, for up to 70 children.  The Project would also include renovating existing worship facilities so the Property can continue to be used by parishioners for such purposes.

25.     On July 17, 2024, the Diocese entered into an Option Agreement where it agreed to enter into a ground lease with PHAD.  That Option Agreement contemplates that a portion of

the Property will be used as (i) approximately seven apartments and ancillary office space, to facilitate the provision of supportive services for victims of domestic violence; (ii) approximately 45 affordable workforce housing units; (iii) a childcare facility; and (iv) worship/contemplative space and the Church memorial grounds.

26.    All of the proposed uses under the Option Agreement are the highest and best uses of the Property for the benefit of the community served by the Church and were all in furtherance of the Church's ecclesiastical and social justice missions.  By way of example only, and without limitation, in the final weeks of 2023, the Trustees of Protestant Episcopal Church in New Hampshire—a corporation for the purpose of holding real and personal property of the Diocese and investing same—voted to make a mission-related investment with the Northern Forest Society in support of affordable housing in the North Country in New Hampshire.  The Diocese had for many years similar investments with the New Hampshire Community Loan Fund.  The Diocese and the Church thus consider housing to be part of the mission of the Church, and thus a part of its ecclesiastical purpose.  The Project is just another logical next step in pursuing that aspect of its mission.

27.    Additionally, the Project would help infuse capital into the Church to ensure its financial survival, which survival aligns with the original donative intent of Stone, who made it a priority to rebuild the Church when it was once destroyed.

### The Need for Affordable Housing in New Hampshire

28.    In New Hampshire, the cost of housing is increasing, and housing production has not kept up with demand.  The dearth of affordable housing in New Hampshire drives inequality

within the State, as the rising costs of housing deepen poverty for lower-income residents.[1]
Sadly, the numbers of New Hampshire's homeless continue to increase.[2]

29.    Lower-income residents of Portsmouth and the surrounding Seacoast Region have a profound need for affordable housing.  According to the Rockingham Planning Commission's 2023 Regional Housing Needs Assessment, the factors impacting the housing market in the Seacoast Region "are exacerbated by the region being the most expensive housing market in New Hampshire."  Housing supply directly impacts economic growth and the area's ability to attract and retain workers and young families.

30.    According to Rockingham Planning Commission's 2023 Regional Housing Needs Assessment, 48% of households in the region in 2020 that rented were cost-burdened, meaning they spent more than 30% of household income on housing costs.  The median rent in 2022 for the region was $1,595.00 per month, with fair market rent for a three-bedroom unit at $1,871 per month.  The fair market rent amount for a three-bedroom unit increased to $2,034 per month in 2023.

31.    Portsmouth itself had 18 participants in the Housing Vouchers program for New Hampshire Housing as of December 2021.  Nine individuals held vouchers and were looking for units.  Another 44 applicants to the program who live in Portsmouth were on the waitlist.

32.    Only a limited area of land in Portsmouth is zoned for multifamily housing.  The Property is one of few properties available for development that is zoned for multifamily housing in Portsmouth.

---

[1] *See, e.g.*, Seacoastonline, "Commentary: Affordable and workforce housing—A crisis we can't afford to ignore in NH" (Oct. 30, 2024), https://www.seacoastonline.com/story/opinion/columns/2024/10/30/commentary-affordable-workforce-housing-perkins-kwoka-morgan-burke/75935004007/.
[2] *See, e.g.*, Seacoastonline, "Commentary: What Seacoast NH must do to create housing" (Nov. 24, 2024), https://www.seacoastonline.com/story/opinion/columns/2024/11/24/commentary-seacoast-nh-housing/76487468007/.

33.    The limited number of affordable housing units in Portsmouth disproportionately burdens families of color and families with children, which families are overrepresented among low-income households and have the greatest need for affordable housing in the area.  The current demographics of Portsmouth and the surrounding area reflect patterns of residential segregation. The Project would increase racial integration in Portsmouth and the Seacoast Region and would help address the need for affordable housing in Portsmouth.  It would also provide much-needed housing for families with children.

### *The Church Requests a Waiver from the Bank*

34.    After the Diocese entered into the Option Agreement, the Church sought the consent of the Bank for the Church's redevelopment plan, and a waiver from the Bank of any possibilities of reverter it may have for any conditions broken upon the realization of the redevelopment.  The Church met remotely with representatives of the Bank to request a waiver and discuss the Project and submitted as a part of its request a letter from Rt. Rev. A. Robert Hirschfeld, the Bishop of the Episcopal Diocese of New Hampshire, explaining how the Project served the Church's ecclesiastical purposes.  That letter is attached hereto as **Exhibit 7**.

35.    Bishop Hirschfeld explained in his letter that the word "ecclesiastical" is understood in the Episcopal Church and its governing documents to mean "of or pertaining to the church," as the "ecclesia" (church) "is called to be Christ's continuing presence in the world." *Id.* at 1.  This interpretation is consistent with the broad dictionary definition, which defines "ecclesiastical" as "of or relating to a church, esp. as a formal and established institution"; "belonging to, suggestive of, or suitable for use in a church building or service of worship"; "churchly"; "of or relating to the formal and established institutions or government of any religion."  Webster's 3d New Intl. Dict. ("Ecclesiastical").

36.     In his letter, the Bishop explained that the affordable housing, shelter for victims of sexual and domestic violence, and expansion of its childcare center are "clear and direct fulfillment of our religious commitments expressed by Jesus Christ, whose teachings, recorded in the Gospels, urge his disciples to care and provide for those in need." **Ex. 7** at 2.  He cited to scriptural passages and parables like the Good Samaritan to illustrate this basic tenet of the Episcopal faith.  *Id.*  The Bishop went on to explain that "[t]his project is consistent with the time-honored tradition of the Christian Church, practiced in the name of Christ for millennia, to build hospitals, to provide sanctuary when violence is threatened, to construct schools for the education of children and youth, and to bury the poor with honor and dignity deprived those during their lifetime."  *Id.*  The Bishop also cited to examples of churches of various denominations seeking to fulfill their Gospel missions by developing affordable housing in various communities across the United States.  *Id.*  The Bishop also described the local community's reaction to the news of the Project as being a positive one, with Church members expressing that "[t]his is the reason why I delight in being a member of the Church!"  *Id.*

37.     By way of letter dated October 14, 2024, the Bank perfunctorily denied the request.  *See* Oct. 14, 2024 Ltr., attached hereto as **Exhibit 8**.  The Bank cited to the 1964 and 1965 Agreements, as well as the Codicil to Stone's will, and concluded that "the Project is not consistent with Stone's donative intent (insofar as it contemplates the construction of new buildings and uses of the Property for other than ecclesiastical purposes) and the Bank does not have the authority under these documents to executive the Waiver."  *Id.* at 2.  The Bank did not provide any additional explanation or information concerning its denial of the request, and declined to engage in any discussion concerning why the Project did not satisfy use of the

Property for "ecclesiastical purposes."  Nor did the Bank explain its mistaken position that it "does not have the authority" to execute the waiver or approve additional buildings.

38.     By denying the request for a waiver, the Bank has singlehandedly upended the Project and denied numerous families with children and racial minorities affordable housing in the Seacoast Region in violation of the Fair Housing Act ("FHA").  Denying the waiver has also imperiled the survival of the Church.

39.     The Bank has also upended a Project designed to provide temporary shelter to victims of sexual and domestic abuse without any good reason for doing so.

40.     The Bank has also thwarted efforts by the Church to expand access to childcare in the region by denying the request for the waiver.

41.     By so doing, the Bank has told the Church that providing all of these services to those in need does not meet the "ecclesiastical purposes" of the Church.  The Bank is wrong.

## COUNT I – DECLARATORY JUDGMENT UNDER RSA 491:22

42.     All of the preceding allegations are incorporated herein.

43.     The Project constitutes a use of the Property for ecclesiastical purposes, and therefore does not violate any restriction imposed on the Church to use the Property for ecclesiastical purposes only.

44.     The Project is intended to be the means by which the Church can fulfill its obligation to love God and neighbor.  According to the Book of Common Prayer ("BCP"), the foundational and primary document of Episcopal theology, worship, and polity, the content of the Church's duty to a neighbor is defined in the Catechism in a brief exposition of the Ten Commandments, which reads: "Our duty to our neighbors is to love them as ourselves, and to do to other people as we wish them to do to us."

45.     This duty includes being honest and fair in all dealings; seeking justice, freedom, and the necessities of life for all people; and using the Church's talents and possessions in such a way as to answer for them to God.

46.     These are the callings and purposes of all members of the Episcopal Church. Statements of moral purpose like this provide much of the basis for ecumenical conversations across many Christian denominations.  They also help shape charitable endeavors within the Christian community, such as the time-honored traditions of the Christian Church to build hospitals, provide sanctuary when violence is threatened, to construct schools for the education of children and youth, and to bury the poor with honor and dignity deprived those during their lifetime.

47.     Seeking ways to materially support efforts that alleviate the critical shortage of adequate and affordable housing, that care for children and support critically needed early education, and that provide freedom from the ravages of domestic abuse and violence, are clearly organic expressions of the Church's duty to fulfill the commandments of God to love in ways that provide significant social, emotional, and spiritual benefit. The Project is therefore an organic expression of the Church's duty and mission and meets its ecclesiastical purpose.

48.     At the time Stone imposed the restriction that the Property only be used for ecclesiastical purposes, the Episcopal Church was marked by an intense care and concern for the poor, the vulnerable and oppressed, and for children of modest means or who were at risk.  For example, for these reasons, many churches were constructed near tenements, factories, mill yards, and mining communities during the 19th and 20th centuries.

49.     The Church has realized this purpose in other ways over the course of the years, including, for example, renting its Rectory in order to house a refugee family.

50.     By allowing the Church to rebuild on the site back in 1964, Stone gave the parish the ability to further its historic purpose to love God and neighbor in a socially engaged manner. It ensured the survival of the Church and its continuation into the future. The Project does the same for the Church and its community, representing an extraordinary instance of ecclesiastic, private, non-profit, and public cooperation that will help the Church continue to thrive and to grow its congregation.

51.     The Bishop's interpretation of the word "ecclesiastical," as described herein, fits within the broad dictionary definition of "ecclesiastical," which definition is not ambiguous.

52.     To the extent the word "ecclesiastical" is ambiguous, it would be considered in context.  That context compels that the Bishop's interpretation of the term would govern, as the parties to the 1964 Agreement were (1) the Church itself and (2) Stone, a member of that Church who presumably understood the Church's interpretation of "ecclesiastical purposes."

53.     For these reasons, the Project satisfies the requirement that the Property be used for ecclesiastical purposes and does not violate any restriction on the Property.  It aligns with donor intent.

54.     For these reasons, the Church is entitled to an order declaring that the Project satisfies ecclesiastical purposes.

## COUNT II – DECLARATORY JUDGMENT UNDER RSA 491:22

55.     All of the preceding allegations are incorporated herein.

56.     The Bank erred when it concluded it did not have the authority to approve the Project.

57.     The terms of the Trust govern the Bank's authority to approve the Project.

58.     The 1965 Agreement provides:

>[W]ith the exception of a garage, which may be constructed subject to the approval of STONE as to architecture, design, building material and location, no other buildings shall be constructed upon the aforesaid property nor ells nor extensions on existing structures unless authorization of STONE is obtained.

**Ex. 3**.

59.    The Agreement allows Stone to appoint a person to succeed to and have the right to authorize the construction of "other buildings" on the Property and approve their architecture, design, building material, and location.  Stone appointed the First National Bank of Portsmouth to succeed to and have these rights.

60.    The Bank is the successor in interest to First National Bank and now has the right to authorize the construction of other buildings on the Property and approve their architecture, design, building material, and location.

61.    The Bank as Trustee may allow additional buildings on the Property.  Nothing in the 1965 Agreement or otherwise restricts its ability to do so.  The only restriction imposed by the 1965 Agreement is that the <u>Church</u> must seek approval for those buildings ahead of time. There is no condition or requirement imposed on the Bank when it elects, in its discretion, to approve buildings on the Property and their architecture, design, building material, and location.

62.    Without the Project, the Church's future is in jeopardy given its finances.  The Bank's failure to take this into consideration was a blatant disregard of its fiduciary duties and an abuse of its discretion.  The Bank made no mention of architecture, design, building material, or location in denying the request for waiver.

63.    Moreover, by failing to authorize the additional buildings and/or approve the Church's request for a waiver of any possibility of reverter, the Bank has made itself vulnerable to claims under the FHA, which constitutes a further disregard of its fiduciary duties and an abuse of its discretion.

64.     For these reasons, the Church is entitled to an order declaring that the Bank has the authority to approve the additional buildings that comprise the Project.

## COUNT III – PETITION TO TERMINATE THE RESTRICTION ON THE PROPERTY OR MODIFY ITS TERMS PURSUANT TO RSA 564-B:4-413

65.     All of the preceding allegations are incorporated herein.

66.     This claim is brought as an alternative claim to those asserted above.

67.     The Property is held in Trust by the Bank following Stone's death and the creation of his testamentary Trust.  Over 21 years have elapsed since the date such Trust was created, as Stone died in 1974.  Further, the Church is an interested person affected by the terms of the multiple restrictions put onto that Trust (i.e., the restriction against use for non-ecclesiastical purposes and the restriction against constructing additional buildings without prior approval), as the Church stands to lose its ownership of the Property should the restrictions not be modified.

68.     Without the Project, the Church will not survive.  The Church will no longer be in a position to continue to use the Property for its congregation given the costs of maintaining the Property and its lack of income to pay for those costs. Use of the Property for ecclesiastical purposes only—assuming for the sake of argument only the Project does not meet such purposes—and the limitation on additional buildings on the Property will become impossible, impracticable, ineffective, and/or prejudicial to the public interest.  It will upend the donor's intent of ensuring the survival of the Church.

69.     Additionally, as discussed in more detail *infra*, rejecting the Project in reliance upon any restriction imposed by Stone is illegal as it violates the FHA.  That alone warrants a termination or modification of the Trust terms.

70.     If the Church does not abide by the restrictions imposed upon it now, the Trust property will not revert back to the settlor, Stone, as Stone has died.  Under New Hampshire law, this and the fact that more than 21 years have passed since the creation of the Trust mean that the Court has the power to apply cy pres pursuant to RSA 564-B:4-413(b).

71.     The Church therefore requests that this Court apply cy pres pursuant to RSA 564-B:4-413 to terminate the Trust, which requires that the Property only be used for "ecclesiastical purposes," to the extent the definition of this term does not include the Bishop's interpretation as described above.

72.     The termination of the Trust would also eliminate the requirement that the Church seek the authority of the Bank before constructing additional buildings on the Property.

73.     Terminating the Trust would allow the Church own the Property free and clear of any encumbrances or restrictions and move forward with the Project.

74.     Alternatively, the Church requests that this Court apply cy pres to (1) modify the restriction imposed on the Church to use the Property for "ecclesiastical purposes" by expanding the scope of this term to include the Bishop's interpretation as described above; and (2) modify the restriction that the Church cannot construct additional buildings without the Bank's approval by limiting the Trustee's discretion to consideration of the buildings' design only.  Limiting the Trustee's discretion to the design only of any new buildings comports with the settlor's intent in the 1965 Agreement, which emphasizes the design of new buildings.  The Church also requests that the Trustee be prohibited from unreasonably withholding its approval of additional construction.  Alternatively, if the Bank's approval cannot be limited to considerations of design only, the Church requests a requirement that the Trustee to consider the best use of the Property and the needs of the community when exercising its discretion.

75.     A modification or termination of the Trust requirements would result in the distribution of the Property in whole or in part to a charitable purpose that is useful to the community and fulfills as nearly as possible the general charitable intent of the settlor, Stone. That is because a modification or termination of the Trust requirements would allow the Church to move forward with the Project and to continue to prosper, as Stone intended. It would also allow the Church to make the best use of the Property for the benefit of the community and assist in meeting significant societal needs consistent with its mission and ecclesiastical purpose.

**COUNT IV – VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3604**

76.     All of the preceding allegations are incorporated herein.

77.     The Bank, through its action of denying the request for a waiver and taking the incorrect position that it did not have the authority to approve the construction of additional buildings, is liable for the violation of the Church's rights under the federal FHA, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

78.     The Bank is further liable under 42 U.S.C. § 3604(b), which makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

79.     The Bank is further liable under 42 U.S.C. § 3604(c), which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or

national origin, or an intention to make any such preference, limitation, or discrimination," based on statements made publicly by the Bank, including but not limited to its October 14, 2024 letter denying the request for a waiver.

80.     The Bank's actions to block the proposed Project are and have been based upon discriminatory motives related to the race, color, national origin, and familial status of the likely tenants of the proposed community and beneficiaries of the Project, specifically the likelihood that the tenant population of the community will include many families with children and/or racial minorities.

81.     The Bank's actions also impose disproportionate harms on families with children and racial minorities by making affordable housing, as well as temporary shelter for victims of domestic and sexual abuse, unavailable to those groups, with the effect of perpetuating segregation in Portsmouth and the Seacoast Region.

82.     The Bank's conduct was intentional, willful, and in reckless disregard of the known rights of others.

83.     The Diocese and the Church have suffered damages as a result of the Bank's conduct.

**COUNT V – VIOLATION OF FAIR HOUSING ACT, 42 U.S.C. § 3617**

84.     All of the preceding allegations are incorporated herein.

85.     The Bank, through its action of denying the request for a waiver and taking the incorrect position that it did not have the authority to approve the construction of additional buildings, is liable for the violation of the Church's rights under the federal FHA, 42 U.S.C. § 3617, under which:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account

of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

86.    The Bank's actions have interfered with the Church's efforts to build and maintain an affordable housing development and temporary shelter for victims of domestic and sexual abuse that would disproportionately benefit families with children and racial minorities. Such actions constitute retaliation against the Church for proposing a project that would serve these groups.

87.    The Bank's actions in interfering with the proposed Project are and have been based on discriminatory motives related to the race, national origin, and familial status of the likely tenants of the development, specifically the likelihood that the tenant population of the development and the beneficiaries of the Project will include families with children and/or racial minorities.

88.    The Bank's actions interfering with the project also impose disproportionate harms on families with children and racial minorities by making the affordable housing, as well as the temporary shelter for victims of domestic and sexual abuse, unavailable to those groups, with the effect of impeding racial desegregation in Portsmouth and the Seacoast Region.

89.    The Bank's conduct was intentional, willful, and made in reckless disregard of the known rights of others.

90.    The Diocese and the Church have suffered damages as a result of the Bank's conduct.

WHEREFORE, the Church and Diocese respectfully request that this Honorable Court:

A.    Enter an order holding that the Project satisfies the requirement that the Property be used for ecclesiastical purposes;

B.     Enter an order holding that the Bank has the authority to approve the additional buildings that comprise the Project;

C.     Alternatively, enter an order holding that the restrictions on the Property should be terminated or modified pursuant to RSA 564-B:4-413 to allow the Project to move forward;

D.     Enter an order concluding that Defendant has violated the FHA;

E.     Award compensatory damages in an amount to be determined by the Court that would fully compensate the Church and the Diocese for the loss that has been caused by Defendant's conduct;

F.     Award the Church and Diocese their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

G.     Order such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

Respectfully submitted,

PARISH OF CHRIST CHURCH, AKA
PARISH OF CHRIST EPISCOPAL CHURCH AND
DIOCESE OF NEW HAMPSHIRE, AKA
EPISCOPAL CHURCH OF NEW HAMPSHIRE

By Their Attorneys,

McLANE MIDDLETON,
 PROFESSIONAL ASSOCIATION

Date:  January 30, 2025          By:/s/ Amanda E. Quinlan
                                 Alexandra S. Cote, NH Bar No. 265806
                                 alexandra.cote@mclane.com
                                 Amanda E. Quinlan, NH Bar No. 269033
                                 amanda.quinlan@mclane.com
                                 900 Elm Street, P.O. Box 326
                                 Manchester, New Hampshire 03105-0326
                                 Telephone:  603.625.6464

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on counsel of record through this Court's electronic filing system and by electronic mail.

Date:  January 30, 2025              /s/ Amanda E. Quinlan
                                     Amanda E. Quinlan